IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALICE FIELDS,

       Plaintiff,

v.

ATLANTA INDEPENDENT SCHOOL
SYSTEM and JESSE LOVELACE,

       Defendants.

CIVIL ACTION NO.

1:11-cv-02775-TWT-RGV

**ORDER FOR SERVICE OF
NON-FINAL REPORT AND RECOMMENDATION**

Attached is the Non-final Report and Recommendation of the United States

Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1), Fed.

R. Civ. P. 72(b), and this Court's Local Rule 72.1. Let the same be filed and a copy,

together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,

to the Report and Recommendation within fourteen (14) days of the receipt of this

Order. Should objections be filed, they shall specify with particularity the alleged

error or errors made (including reference by page number to the transcript if

applicable) and shall be served upon the opposing party. The party filing objections

will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the district court. If no objections are filed, the Report and

Recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Report and Recommendation with objections, if any, to the district court after expiration of the above time period.

**IT IS SO ORDERED**, this 30th day of November, 2012.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALICE FIELDS, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:11-cv-02775-TWT-RGV |
| ATLANTA INDEPENDENT SCHOOL SYSTEM and JESSE LOVELACE, | |
| Defendants. | |

## MAGISTRATE JUDGE'S NON-FINAL REPORT AND RECOMMENDATION

Defendants Atlanta Independent School System ("AISS") and Jesse Lovelace ("Lovelace"), collectively referred to herein as "defendants," move for summary judgment in this action filed by plaintiff Alice Fields ("Fields"), a former AISS bus driver, alleging gender discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. § 1983 ("§ 1983"), and state law claims of negligent supervision, hiring, training and/or retention; assault and battery; invasion of privacy; and intentional infliction of emotional distress ("IIED"). [Doc. 53].[1] Fields has filed a response in

_____

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF , except that deposition transcripts, which have been filed as hard copies, are cited according to the transcript page numbers.

opposition to defendants' motion for summary judgment, [Doc. 60], to which

defendants have replied, [Doc. 69]. For the reasons stated herein, it is

**RECOMMENDED** that defendants' motion for summary judgment, [Doc. 53], be

**GRANTED** in part and **DENIED** in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Preliminary Matters

As required by Local Rule 56.1B(1), defendants have included with their

motion a statement of material facts to which they contend there is no genuine issue

to be tried. LR 56.1B(1), NDGa.; <u>see also</u> [Doc. 53-2 (defendants' statement of facts)].

Fields has responded to defendants' statement of facts, admitting certain facts,[2] but

asserting that some of the evidence relied upon by defendants is inadmissible. <u>See</u>

[Doc. 60-2 ¶¶ 1-3].[3] Fields has also submitted her own statement of material facts

which she contends present genuine issues for trial, [Doc. 60-1], to which defendants

---

[2] <u>See</u> [Doc. 60-2 (admitting ¶¶ 4, 6, 12, 15-20, 26, 33 and 37 and parts of ¶¶ 5, 7, 10, 13, 21-25, 27-32, and 34-36 of defendants' statement, Doc. 53-2)].

[3] Fields also objects to one of defendants' statements of fact by asserting that it does not comply with Local Rule 56.1B(1) because whether or not AISS's policy provides for reasonable complaint procedures is an issue or legal conclusion. <u>See</u> [Doc. 60-2 ¶ 19]. The Court agrees with Fields and accordingly will consider the language of the policy but not accept as an undisputed fact that it is necessarily reasonable.

have responded, [Doc. 70].[4]  In their reply to Fields' response opposing summary

judgment, defendants contend that Fields impermissibly relies on inadmissable

hearsay and assert that her statement of facts does not comply with Local Rule 56.1.[5]

See [Doc. 70 ¶¶ 33, 47-48, 52-53].  Under Local Rule 56.1B(2), the Court accepts as true

those facts which are admitted or which are improperly denied, LR 56.1B(2)a(2),

NDGa., and will now turn to the objections raised by the parties.

1.      *Defendants' Failure to Initially Disclose*

Fields objects to several statements of fact submitted by defendants on the

grounds that the facts are supported by the affidavit of Howard W. Grant ("Grant"),

whom defendants failed to disclose as a witness in their initial disclosures, in

---

[4] See [Doc. 70 (conceding consideration of ¶¶ 1, 3, 6, 9-10, 12-14, 21, 27-31, 34-35, 37-43, 45, and 49-51 of Fields' statement, Doc. 60-1)].

[5] Specifically, defendants contend that Fields statement that she was subject to "severe episodes of sexual harassment" and a "hostile work environment," see [Doc. 70 ¶ 47], as well as her statement that Lovelace was accused of having engaged in sexually inappropriate conduct, see [id. ¶ 53], are statements of legal conclusions.  The Court agrees that whether Fields suffered sexual harassment or a hostile work environment are legal conclusions, and accordingly will not consider that statement for purposes of the summary judgment motion. See [Doc. 60-1 ¶ 47].  However, the Court finds that whether Lovelace was accused of sexual harassment or misconduct is a factual statement and not a legal issue or conclusion, and will accordingly consider this statement for purposes of the summary judgment motion to the extent it is relevant. See [id. ¶ 53].  Moreover, although defendants assert that the fact that Fields did not have health insurance while working at AISS is irrelevant, see [Doc. 70 ¶ 48], the Court finds that this fact is relevant to the extent defendants have questioned why Fields did not seek medical treatment earlier and accordingly will consider it for purposes of the parties' arguments on this point.

supplemental disclosures, or at any point during discovery in contravention of Federal Rule of Civil Procedure 26(a) and (e). <u>See</u> [Doc. 60-2 ¶¶ 1-3]. Fields asked in an interrogatory that defendants identify each person likely to have discoverable information they may use in support of their defenses. <u>See</u> [Docs. 9 at 6]; <u>see also</u> Fed. R. Civ. P. 26(a)(1)(A)-(B) (requiring the parties to disclose the names of all people likely to have discoverable information and a copy of all documents the party may use to support its claim); Fed. R. Civ. P. 26(e)(1)(a) (requiring parties to supplement disclosures in the event information is discovered that renders an earlier response incomplete or incorrect). However, defendants did not disclose Grant as an individual with information about the case. <u>See</u> [Doc. 9 at 10-13].

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c); <u>see also</u> <u>United States v. Batchelor-Robjohns</u>, No. 03-20164-CIV, 2005 WL 1761429, at *2 (S.D. Fla. June 3, 2005) (citations omitted) (noting that the "burden rests upon the non-producing party to demonstrate that its actions were substantially justified or harmless"). Defendants have offered no explanation for their failure to disclose Grant during discovery or to supplement their discovery responses in accordance with the Federal Rules of Civil Procedure.

Moreover, because discovery is closed, defendants' failure to provide this evidence cannot be cured. Accordingly, the Court sustains Fields' objections with respect to Grant's affidavit, [Doc. 53-4], and this evidence will not be considered when evaluating defendants' summary judgment motion, see Cooley v. Great S. Wood Preserving, 138 F. App'x 149, 161 (11th Cir. 2005) (per curiam) (unpublished); Roberts v. Scott Fetzer Co., No. 4:07-CV-80 (CDL), 2010 WL 3546499, at *6-9 (M.D. Ga. Sept. 7, 2010).

    **2.**    *Hearsay Objections to Fields' Evidence*

Defendants raise hearsay objections to some of Fields' evidence, see [Doc. 70 ¶¶ 33, 52], asserting that Fields offers "written or oral assertions of a person made in a non-testimonial environment . . . to prove the truth of the information contained." see Fed. R. Evid. 801. Specifically, defendants object to Fields' reliance on her deposition testimony regarding what Olga Martin ("Martin"), another AISS bus driver, told her about a meeting held after Fields had been discharged in which AISS told employees where to go on the website to find the sexual harassment policy and procedures. See [Doc. 58-2 (Fields Dep. Pt. 2) at 116, 132]. Defendants also object to consideration of allegations that Lovelace was rumored to have been involved in romantic and/or sexual relationships with several subordinate female bus driver employees as hearsay. See [Doc. 58-1 (Fields Dep. Pt. 1) at 68; Doc. 58-2 at 133, 138,

145, 172; Doc. 65 (Lovelace Dep.) at 21].  The Court agrees that this evidence, consisting of Fields' testimony relaying out-of-court statements previously made by other individuals, constitutes inadmissible hearsay to the extent it is offered to prove the truth of those individuals' statements, and accordingly will not consider this evidence when ruling on defendants' summary judgment motion.

**3.** *Sufficiency Objections to Fields' Evidence*

Defendants also object to many of Fields' statements of fact on the basis that they are supported only by citations to Fields' deposition or declaration, asserting that her self-serving statements are insufficient to raise a genuine issue of material fact.  See [Doc. 70 ¶¶ 2, 4-5, 7-8, 11, 15-20, 22-26, 32, 36, 44, 46].  However, these objections do not comply with the Local Rules since defendants are not objecting on the basis that Fields' evidence is inadmissible, does not support the asserted fact, or is immaterial.  See LR 56.1B(3).  Accordingly, relevant facts supported by Fields' deposition testimony and declaration will be considered for purposes of the summary judgment motion.[6]

---

[6] Moreover, nearly all of the facts to which defendants assert this objection are descriptions of the alleged sexual harassment, and defendants concede that the record establishes genuine issues of material fact with respect to whether Fields was subjected to unwelcome sexual harassment based on her sex.  See [Doc. 53-1 at 6]. Additionally, defendants' assertion that this self-serving testimony is insufficient to create a genuine issue of material fact will be addressed by the Court as it considers the merits of defendants' summary judgment motion.

## B.    Relevant Facts

### 1.    *Background Information*

Fields was hired by AISS in or about August of 2008 as an hourly wage school bus driver in the Transportation Department.[7] [Doc. 60-5 (Fields Decl.) ¶ 2; Doc. 58-1 at 43-48; Doc. 65 at 12].    At all times relevant to this matter, Lovelace was a Transportation Supervisor for AISS, meaning that he was responsible for the supervision of approximately 100 bus drivers, including Fields.  [Doc. 65 at 11-12]; see also [Doc. 58-1 at 76; Doc. 60-5 ¶ 4 (establishing that Fields reported to and worked under the direct supervision of Lovelace)].  Lovelace's first-line supervisor was Assistant Transportation Director Karen Williams ("Williams").  [Doc 65 at 14]; see also [Doc. 58-1 at 81; Doc. 58-2 at 159-60, 174].  Lovelace also reported to his second-line supervisor, Transportation Director Harold Walker ("Walker").  [Doc. 58-1 at 81; Doc. 58-2 at 160; Doc. 63 (Walker Dep.) at 7].

AISS policies, which are available online at the AISS public website, expressly prohibit sex-based discrimination, sexual misconduct, and sexual harassment.[8] [Doc.

_____

[7] Prior to working at AISS, Fields was employed by Assurant and the Gwinnett County School District.  [Doc. 58-1 at 13-25].  She reported one instance of non-sexual unfair treatment at each employer via a formal complaint against her direct supervisor.  [Id.].

[8] Fields asserts that she was unaware of this policy and of the procedures for filing a complaint.  See [Doc. 60-2 ¶¶ 17-20].

53-3 (Conyers Aff.) ¶¶ 6-7 & Exs. A, B].  The AISS policy defines sexual harassment

as follows:

> Sexual harassment is a specific form of sexual misconduct.  As defined by the Equal Employment Opportunity Commission (EEOC) and the Office of Civil Rights (OCR), sexual harassment consists of unwelcome sexual advances, requests for sexual favors, sexually motivated physical conduct, or other verbal or physical conduct or communication of a sexual nature when:

> > 1.  Submission to such conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining or retaining employment, educational opportunities, or other benefits provided by the Atlanta Public Schools.

> > 2.  An individual's submission to, or rejection of, such conduct or communication is used as a factor in decisions affecting that individual's employment, educational opportunities, or other benefits provided by the Atlanta Public Schools; or

> > 3.  Such conduct or communication has the purpose or effect of substantially or unreasonably interfering with an individual's employment, or creating an intimidating, hostile, or offensive working or learning environment.

[Id. ¶ 7].  With respect to complaint procedures, the policy provides in pertinent part:

> Any employee (full-time, part-time, hourly), contractor, or consultant who believes that he or she has been exposed to unwelcome sexual or sex-based misconduct should immediately report the alleged act to a principal, assistant principal, director, executive director, or other senior level administrator.

[Id. ¶ 8]. Moreover, since approximately 2000, AISS has had an Office of Internal Resolutions/Employee Relations ("OIR") dedicated to addressing issues pertaining to employee relations. See [id. at ¶¶ 3, 9]. At any given time, AISS has had as many as five Employee Relations Officers, and OIR is responsible for investigating complaints of discrimination and sexual harassment, monitoring complaint activity, providing guidance and support to departments, addressing complaints of discrimination and/or harassment, and providing regular training sessions district wide (including to the transportation department) that include sexual harassment training. [Id.].

AISS also specifically provides annual sexual harassment training to transportation department employees. [Doc. 64 (Partridge Dep.) at 52-59]. This training, conducted by Charlotte Partridge ("Partridge"), at South Atlanta High School, was provided for all bus drivers in August of 2008. See [id. at 89-90, 95, 98-99]; see also [Doc. 58-1 at 44; Doc. 58-2 at 195-96; Doc. 65 at 44, 66-67]. During this training session, Partridge reviewed portions of a transportation department handbook, which is primarily filled with information relating to the safe and proper operation of school buses and the transportation of students. See [Doc. 58-5 at 6-8]; see also [Doc. 58-2 at 196]. On one day during this week of training, everyone met in a large group for state-mandated training in the morning and district-mandated

training in the afternoon, and during the afternoon session, someone from Human Resources ("HR") or OIR discussed the sexual harassment policy, which was presented to the employees in a separate packet from the transportation department handbook. [Doc. 64 at 55-60, 98-99, 107-08; Doc. 64-1 at 27-43]. Employees were then required to sign an acknowledgment form[9] in the transportation department handbook, regarding the policy and write down any questions they had which were later answered during individual follow-up sessions.[10] See [Doc. 64 at 89-90; Doc. 58-5 at 39].

Although Fields admits that she "recognized" the transportation department handbook used by Partridge in this training and that she remembers attending a large meeting at South Atlanta High School, [Doc. 58-2 at 195-96], she testified that she was excused from the afternoon portion of the training because she already had the necessary school and passenger endorsement authorizing her to transport school

---

[9] This form is the only reference in the transportation department handbook to sexual harassment. See generally [Doc. 58-5].

[10] In addition to describing this training session, Partridge testified that she distributes and discusses an excerpt from the personnel handbook to potential employees on the first day they report to AISS before they are even officially hired in order to avoid any misconduct during that day. See [Doc. 64 at 93-95, 104]. This excerpt defines sexual harassment and misconduct and states that any such behavior is forbidden by AISS. [Doc. 64-1 at 44-45]. It does not describe the appropriate reporting procedures if any such incident occurs. See [id.].

children.[11]  [Doc. 58-1 at 46-47; Doc. 58-2 at 195].   Fields asserts that she was not in

attendance at any AISS training session during which the sexual harassment policy

and/or reporting procedures were discussed, reviewed or disseminated,[12] see [Doc.

58-2 at 124-25, 194-95, 204], and that she never reviewed any such policy online

during her employment with AISS, [id. at 124; Doc. 60-5 ¶ 25].

### 2.    *Events Forming the Basis of Fields' Complaint*

#### a.    Events During the 2008-2009 School Year

Fields alleges that soon after she began working for AISS in August of 2008,[13]

---

[11] Conversely, Partridge testified that attendance at this week-long classroom portion of annual training was mandatory for everyone, even employees like Fields who had pre-existing bus driver licenses, and that no one would have been excused from any of the classroom portions of the orientation program.  [Doc. 64 at 43, 90, 98-99].

[12] AISS has not produced the acknowledgment form from the transportation department handbook signed by Fields, nor does her personnel file contain the long form checklist indicating she received information about the sexual harassment policy.  See [Doc. 64 at 73-76].

[13] Although Fields alleges that the harassment "started within a couple of months of her employment with . . . AISS," see [Doc. 1 ¶ 21], her Charge of Discrimination filed with the EEOC alleges that the harassment actually began in May of 2009, see [Doc. 58-1 at 73].  However, Fields testified that several additional instances of harassment, dating back to the time period alleged in her complaint, were revealed during the course of the EEOC's investigation, see [Doc. 60-5 ¶ 32].  Thus, to the extent defendants' observation of the date discrepancy amounts to a challenge regarding Fields' exhaustion of administrative remedies for earlier events, it has no merit, see Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1303 (N.D. Ga. 2009), adopted at 1290 (noting that a Title VII action is not limited to the verbatim accusation the EEOC charge contains, but is instead limited in scope to the

Lovelace engaged in a number of unwelcome, uninvited sexual advances toward her.[14]  [Doc. 58-1 at 73; Doc. 58-2 at 147-68; Doc. 60-5 ¶ 5].  These alleged advances included inappropriate sexual comments.  For example, Fields asserts that Lovelace remarked to her about the size of the other women on the job and he told her that her shape looked good to him, stating that she had a "big butt" like another female co-worker.  [Doc. 58-2 at 146, 151-52; Doc. 60-5 ¶ 6].  She also testified that in October of 2008, she went into Lovelace's office[15] to request a personal day off, and that Lovelace began to improperly ask her questions about how she performs sexual intercourse with her boyfriend, prompting Fields to respond that her personal life was none of Lovelace's business.  [Doc. 58-2 at 149-50; Doc. 60-5 ¶ 7].  Fields also described two other occasions in the fall of 2008 when she went into Lovelace's office to discuss student-related issues and Lovelace requested to see her cell phone and began scrolling through her call log and text messages, indicating that he wanted to see text messages that her boyfriend had sent to her.  [Doc. 60-5 ¶ 8].

_____

EEOC investigation that can reasonably be expected to grow out of the explicit accusations in the charge).

[14] Lovelace denies that any of the events Fields describes took place.  See [Doc. 65 at 70-78].

[15] Fields testified that Lovelace had his own office the entire time she worked at AISS, see [Doc. 58-2 at 164], but Lovelace testified that he was in a cubicle until late January or early February of 2009, when he moved into an actual office with four walls and a door, see [Doc. 65 at 12].

Fields also alleges that Lovelace touched her inappropriately and propositioned her for sex. For example, she testified about one occasion in early 2009 when Lovelace walked up behind her in the common area, brushing his hand across her buttocks, at which point Fields claims she turned around to face Lovelace and told him not to touch her. [Doc. 58-2 at 146, 157; Doc. 60-5 ¶ 9]. Fields further testified that around the same time as this incident, Lovelace had the receptionist call her during her afternoon bus route to tell her that Lovelace wanted her to call him at his desk. When Fields pulled her bus over and called Lovelace, he told her that he wanted her to park her bus at a school and go with him to a hotel, but she refused, telling Lovelace he was crazy and ended the call.[16] [Doc. 58-2 at 154; Doc. 60-5 ¶ 11]. Finally, Fields testified that Lovelace propositioned her for sex a second time in May of 2009. [Doc. 58-2 at 157; Doc. 60-5 ¶ 12].[17]

---

[16] Fields maintains that subsequent to these incidents, she informed Lovelace that she had told her boyfriend about his behavior, but Lovelace responded that he did not care. [Doc. 58-2 at 148-49; Doc. 60-5 ¶ 11]. Fields also testified that her relationship with her boyfriend ultimately ended because he was bothered by Lovelace's continued harassment of her and the fact that she was unable to prevent it from happening. See [Doc. 58-1 at 72-73].

[17] Despite these allegations, the parties agree that Fields has never ridden in Lovelace's car, been to Lovelace's house, been out to eat with Lovelace, called Lovelace on his home phone number, received a call from Lovelace on her cell phone, received a text from Lovelace, or exchanged e-mails with Lovelace. [Doc. 58-1 at 58-60].

b.      **Events During the 2009-2010 School Year**

i.      **Sign-in Sheet Incident**[18]

As an hourly wage bus driver, Fields had the entire summer of 2009 off, and did not drive any routes for AISS. [Doc. 58-1 at 75, 83]. She reported back to work on August 5, 2009, for a series of "dry-runs" on her assigned bus route, during which the bus drivers "had to come in and drive their routes, and learn their routes." [Id. at 192]. Fields drove her route for three consecutive days, from August 5, 2009, through August 7, 2009, [id. at 192-93], but she did not attend any other training sessions, seminars, or presentations offered by AISS during this particular time period, [id. at 193].

On August 28, 2009, Fields signed in her co-worker, Lakeisha Johnson ("Johnson"), on the dispatch sign-in sheet because Johnson had called Fields to say that she would be a few minutes late. [Doc. 58-1 at 88-93; Doc. 60-5 ¶ 26]. Fields testified that by signing in Johnson, she was trying to let the dispatcher know that

_____

[18] In addition to the sign-in sheet incident involving Fields described in detail here, two other sign-in sheet incidents occurred on August 26 and August 27, 2009. See [Doc. 65 at 26-31]. On August 26, 2009, Helen Simmons ("Simmons") signed in co-worker Jelina Brooks ("Brooks") and on August 27, Janet Finch ("Finch") signed in Brooks. [Id. at 26-27]; see also [Doc. 65-1 at 7]. In addition, several years before the incidents described here, several bus drivers were fired for falsifying documents when they signed in and tried to collect paychecks for field trips which they had not actually driven. See [Doc. 63 at 30-31; Doc. 64 at 63-65; Doc. 65-1 at 9; Doc. 66 (Williams Dep.) at 16].

Johnson's bus route would be covered that day, [Doc. 58-1 at 88, 92], and she was not aware that there was anything wrong with signing in another driver on the dispatch sign-in sheet,[19] [id. at 92-93, 96, 119, 204]. After Fields signed in Johnson, Johnson called back to say that she would not make it after all, and asked Fields to scratch her name off the sign-in sheet. [Id. at 89, 91-92]. As Fields was marking out Johnson's name, Carol Lupoe ("Lupoe"), who was working as the AISS dispatcher at the time, told Fields that she could not sign in or scratch off another bus driver from the sign-in sheet and subsequently reported the incident to Lovelace and Walker. [Id.]. Initially, Lovelace treated the sign-in sheet infraction as a minor matter, warning Fields that she would be written up if she ever did it again. [Id. at

---

[19] Specifically, Fields states that she was aware that other bus drivers had signed in for co-workers who were running a little late in the past, and that those drivers had not received any disciplinary action. [Doc. 60-5 ¶ 27]. Moreover, Williams, the Assistant Director of Transportation, also testified that she was unaware that there was anything improper or wrong with having one bus driver sign the name of another driver who was running a few minutes late on the dispatch sign-in sheet, testifying that she recalled another incident in which a bus driver had called in to ask a co-worker to sign her in because the driver was stuck in traffic and running late, later calling back and telling that same co-worker to scratch her name off the sign-in sheet because she was not going to make it in time. [Doc. 66 at 18-20, 39-42]. Williams stated that the dispatch sign-in sheet "was not a pay sheet" and that it was instead "more of an attendance sheet," which was designed to let the dispatcher know whether the assigned bus routes were being covered, so "there was never an intent to falsely claim time" and she did not think this action merited discipline as severe as termination. [Id. at 41-42]. Fields further testified that drivers "clock in and out every day on the time clock" and that she thought that the sign-in sheet "was for the dispatch[er] to know whose route had to be covered." [Doc. 58-1 at 96].

93]. As AISS's investigation of the sign-in sheet incident progressed,[20] Fields believed that she would receive a hearing about the sign-in sheet incident, even though she was an hourly employee. [Id. at 102-03]; see also [Doc. 58-3[21] at 7 (AISS memo signed by Lovelace, dated September 3, 2009, requesting a disciplinary hearing for Fields)[22]]. Ultimately, however, Fields did not receive a hearing since she was an hourly

---

[20] As part of AISS's investigation of this incident, Fields wrote two separate statements to Lovelace describing what happened that day. [Doc. 58-1 at 93-97]. In her first written statement, Fields omitted the fact that she had signed in Johnson on the sign-in sheet, and talked only about how she had scratched Johnson's name out. [Id.]. In her second written statement, Fields admitted that she had signed Johnson in on the sign-in sheet on August 28, 2009. [Id.]. Defendants assert that this statement amounts to an admission that Fields falsified records, [Doc. 53-2 ¶ 13], however, Fields contends that she merely admitted to signing in a co-worker, which she believed was not a violation of policy, and that AISS subsequently characterized her action as "falsifying records" as a pretext for firing her, [Doc. 60-2 ¶ 13].

[21] Although this memorandum allegedly contains Fields' signature, she asserts that she never saw the document prior to this litigation and that the signature is not hers. [Doc. 58-2 at 101-02].

[22] Lovelace testified that he submitted this request because "at the time [he] didn't know [Fields] was hourly" and thus not entitled to a hearing. [Doc. 65 at 41]. He testified that he did not find out Fields was hourly until someone from HR told him that she was not entitled to a hearing. [Id.].

employee, and instead just had an in-house meeting with Walker.[23] See [Doc. 58-2 at 110-12; Doc. 63 at 17, 20-22, 26, 75; Doc. 65-1 at 10; Doc. 66 at 25-26].

### ii.    Continued Alleged Sexual Harassment

Fields alleges that when the 2009-2010 school year started, Lovelace became more aggressive toward her, making unwelcome and inappropriate comments on a regular basis and on "several occasions" attempting to touch or actually touching her breasts or buttocks while she was in his office behind closed doors. [Doc. 60-5 ¶ 13]. For example, Fields testified that Lovelace told her that she had a "nice butt" and "nice breasts." [Id.]. She further testified that on August 28, 2009, in the midst of reviewing the sign-in sheet associated with the previously described incident, Lovelace commented to her that her "butt fits perfectly in her uniform pants," [Doc. 58-2 at 158; Doc. 60-5 ¶ 13], and that on August 31, Lovelace asked her if she was wearing a designer bra underneath her uniform shirt when she went into his office to discuss her written statement about the sign-in sheets, [Doc. 58-2 at 183; Doc. 60-5 ¶ 15].

_____

[23]  The other individuals implicated by the sign-in sheet incidents, Brooks, Finch, Johnson, and Simmons, all salaried employees, received hearings. [Doc. 63 at 93-95; Doc. 63-1 at 9-18, 21-22; Doc. 65-1 at 10]. After these hearings, Walker made a recommendation to HR regarding appropriate discipline for the salary employees, which was then approved by the superintendent of the school district. [Doc. 63 at 81-83].

With respect to incidents of inappropriate touching, Fields specifically describes an incident on September 1, 2009, when Lovelace approached her in the break room, asked to see her in his office, and then proceeded to close the office door and touch her buttocks, prompting Fields to open the door and storm out. [Doc. 58-2 at 157; Doc. 60-5 ¶ 13]. Fields further testified that the next day she received a telephone call from Johnson, instructing her to call Lovelace, and when Fields contacted him, Lovelace told her that she needed to come to the office to complete another written statement about the August 28th sign-in sheet incident.[24] [Doc. 58-2 at 166; Doc. 60-5 ¶ 17]. Fields stated that even though she was off work because her son was sick, Lovelace insisted that she prepare the statement, so she went to his office, where, despite her reservations, Lovelace allegedly convinced her to close the door, stating that company policy prevented him from discussing private matters with the door open. [Doc. 58-2 at 166; Doc. 60-5 ¶ 17]. Fields testified that as she stood bent over the desk revising her written statement about the August 28th incident, Lovelace came around the desk and "forcibly grabbed her buttocks," pressing his private parts against hers while stating that he wanted to have sex with

---

[24] Lovelace denies that he instructed Fields to write a second statement. [Doc. 65 at 29]. Instead, he testified that Fields came back and gave him a second statement "on her own will," and that she did not prepare that second statement in his office. [Id. at 29-30]. He asserts that all five drivers associated with the sign-in sheet incidents heard they were going to be in trouble and subsequently provided him with second statements. [Id. at 30-31].

her. [Doc. 58-2 at 166; Doc. 60-5 ¶ 17]. Fields asserts that she turned and pushed Lovelace away from her, and that as she opened the door and walked out, Lovelace warned her not to tell anyone about the incident. [Doc. 58-2 at 166; Doc. 60-5 ¶ 17].

Fields also described an incident that occurred several weeks later, on the afternoon of September 16, 2009, when she approached Lovelace just inside the entrance to a building to get his approval to have an unruly student expelled from riding her bus. [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18]. Lovelace told her that he could not talk to her "right here, right now" and asked her if she wanted to walk with him over to another building so that she could explain the situation. [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18]. Fields agreed and walked with Lovelace, explaining what had happened with the student, and Lovelace used his key to unlock the back door of a second building. [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18]. Fields testified that they then walked inside and down a hallway into a storage room, where Lovelace retrieved a box from the top shelf, looked through it, and pulled out a document. [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18]. She asserts that after Lovelace confirmed that she had told him everything about the incident with the student, he walked over and closed the storage room door, unzipped his pants, and took out his penis as he walked back toward her. [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18]. Fields testified that Lovelace then grabbed at her blouse, exposing her left breast, while

telling her "just let me put it in, let me put it in." [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18]. Fields stated that she attempted to fight him off and escape from the room, but Lovelace pinned her against the closed door, pulled down her pants, and tried to force his penis through the cheeks of her buttocks, causing Fields to scream out "Stop!," at which point Lovelace released her and Fields left the storage room and quickly drove home "in a complete state of shock, panic and disbelief." [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18].

Fields also testified that, following this incident, on the morning of September 29, 2009, Lovelace called her into his office for a meeting, and then immediately asked her to turn around so that he could "look at her butt." [Doc. 60-5 ¶ 21]. She asserts that she refused his request and walked out, and she alleges that later that afternoon Lovelace gave her an unwarranted written warning for tardiness. [Id.]. Fields also testified that several days later, on October 1, 2009, she returned to Lovelace's office to ask him about the date of the hearing for the sign-in sheet incident, and informed Lovelace that he would not be touching her anymore.[25] [Doc. 58-2 at 178; Doc. 60-5 ¶ 22]. The next day, October 2, Lovelace called Fields into his

---

[25] Fields asserts that Lovelace told her that if she did not allow him to touch her, he would not grant her a hearing regarding the sign-in sheet incident. [Doc. 58-2 at 178; Doc. 60-5 ¶ 22]. Fields maintains that she told Lovelace that he was not being fair to her by not granting her a hearing, but Lovelace replied by stating that he did not have to give an hourly employee a hearing and that he therefore did not need a reason to fire her. [Doc. 58-2 at 178; Doc. 60-5 ¶ 22].

office and told her to sign a form terminating her from her position, stating that he was sorry that he had to let her go, and he allegedly then asked if he could give her a hug.[26]   [Doc. 58-2 at 108, 122; Doc. 60-5 ¶ 23; Doc. 58-3 at 8 (memo terminating Fields)].  Brooks, Finch, Johnson, and Simmons,  who were involved in similar sign-in sheet incidents, were also terminated from AISS.[27]  See [Doc. 58-2 at 104; Doc. 65-1 at 6].

Prior to her termination, Fields told Johnson, Terry Elder ("Elder"), and Maury Morris ("Morris"), all of whom are AISS employees, that Lovelace had been sexually

---

[26] Lovelace asserts that he "prepared [Fields'] case and submitted it to" Walker, who then "made the recommendation" that Fields be terminated.  [Doc. 65 at 33-34, 39-40].  When pressed for clarification, Lovelace testified that "[a]s transportation supervisor, [the decision to terminate] is based on [his] findings, what [he] present[s] to [] Walker, and [Walker] makes the determination whether to suspend, fire . . ."  [Id. at 36].  In other words, Lovelace testified that he "collected all pertinent information, evidence, and submitted it to [] Walker for his determination . . . ."  [Id.].

[27] Walker testified that Fields and the salaried employees were all treated the same way because they had engaged in the same behavior.  [Doc. 63 at 84].  With respect to timing, Walker testified that the recommendation to fire the salaried employees was also drafted by Lovelace on October 2, 2009, the day after their hearing took place.  See [Doc. 63 at 93-95; Doc. 63-1 at 9-12].  Walker, however, did not sign this recommendation until October 5, 2011, and it was then sent on to the superintendent for her approval.  See [Doc. 63 at 93-95; Doc. 63-1 at 9-12].  Following that approval, the salaried employees were actually laid off on October 12, 2009.  See [Doc. 63 at 93-95; Doc. 63-1 at 13-18, 21-22].

harassing her,[28] [Doc. 58-2 at 114, 200-01; Doc. 60-5 ¶ 19], but she never officially

reported the alleged harassment or inappropriate conduct by Lovelace because she

believed her job would have been in jeopardy if she had made a report,[29] [Doc. 58-2

at 114, 117-21, 158, 167, 171-72; Doc. 60-5 ¶ 28].  Moreover, Fields never made an

anonymous report of her allegations to AISS, either during or after her employment,

[Doc. 58-2 at 123], and although a church pastor advised her to take her allegations

to the police, she did not do so,[30] [Doc. 58-1 at 86-88; Doc. 58-2 at 129, 171].  On

December 22, 2009, Fields filed a Charge of Discrimination with the EEOC.  [Doc. 60-

---

[28] Fields told Johnson about the harassment on September 24, 2009, but she did not provide details of the September 16, 2009, incident.  [Doc. 58-2 at 114, 172].

[29] Indeed, despite the fact Elder made Fields aware that she was able to file a complaint by advising her to report the allegations to AISS's HR Department, Fields failed to do so, asserting both that she was unaware of the appropriate procedure and that she was afraid such a report would cause her to lose her job.  [Doc. 58-2 at 117, 158, 160]; see also [Doc. 58-2 at 155, 199; Doc. 60-5 ¶ 2 (Fields testifying that Lovelace constantly reminded her that her at will employment could be terminated for any reason or for no reason at all, and that she was particularly intimidated by this threat given her status as a single parent)].

[30] Fields contends that she did not go to the police because she did not think they would take her seriously since Lovelace used to be a police officer.  [Doc. 58-1 at 86-88; Doc. 58-2 at 129, 171].  Additionally, although Fields returned after her termination to attend the administrative hearing for Brooks as a witness, she did not report the sexual harassment to HR at that time.  See [Doc. 58-2 at 104, 106, 122]. Fields asserts that she was directed by Brooks' lawyer not to speak of her personal experiences.  See [Doc. 60-2 ¶ 34].

5 ¶ 32].  After Fields filed this Charge, AISS engaged an external investigator to investigate Fields' allegations.  [Doc. 65 at 15].

In February of 2010, several months after her discharge from AISS, Fields moved back to Memphis, Tennessee, to be closer to her family and because she says that she was afraid to continue living in Georgia after having filed her claim of sexual harassment against Lovelace.  [Doc. 58-1 at 57-58; Doc. 60-5 ¶ 30].  Fields lived with her mother when she first moved back to Memphis, and her mother noticed that Fields was sitting around the house, doing a lot of rocking back and forth with her leg shaking up and down.  [Doc. 58-2 at 199; Doc. 60-5 ¶ 31].  As a result, Fields' mother told Fields that she needed to seek medical treatment/counseling, [Doc. 58-2 at 199; Doc. 60-5 ¶ 31], and Fields first sought that medical treatment/counseling in May or June of 2010, approximately 8 to 9 months after her separation from AISS,[31] [Doc. 58-2 at 190; Doc. 60-5 ¶ 31].  By that time, Fields was already represented by counsel.  [Doc. 58-1 at 85; Doc. 58-2 at 190].  Fields claims that these events have caused her to suffer extreme emotional harm, including bouts of depression, sleeplessness, anxiety, and various other psychological and emotional issues, and has presented medical evidence of these symptoms, including a clinical diagnosis of

---

[31] Fields asserts that she did not seek medical treatment earlier because she did not have health insurance.  [Doc. 58-1 at 48; Doc. 60-2 ¶ 35].

post-traumatic stress syndrome. [Doc. 58-2 at 188-89; Doc. 60-5 ¶ 29; Doc. 58-3 at 65-100].

## C.    Allegations

As a result of these alleged events, Fields brings this action asserting claims against AISS for gender discrimination and sexual harassment in violation of Title VII and the Equal Protection Clause pursuant to § 1983 as well as a claim for negligent supervision, hiring, training, and/or retention.[32] [Doc. 1 ¶¶ 47-60. 94-102]. She also brings claims against Lovelace for gender discrimination and sexual harassment in violation of the Equal Protection Clause under § 1983 and for assault and battery, invasion of privacy, and IIED. [Id. ¶¶ 76-93]. Fields seeks punitive damages against Lovelace under O.G.C.A. § 51-12-5.1, and attorneys' fees from both defendants. [Id. ¶¶ 103-07].

## II. SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court views all evidence in the light most favorable to and draws all reasonable inferences in the favor of the non-moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Cargo v.

---

[32] In her response to defendants' motion for summary judgment, Fields abandons and withdraws her claims against AISS under § 1983 and for negligent supervision, hiring, training, and/or retention. See [Doc. 60 at 30]. Accordingly, it is **RECOMMENDED** that defendants' motion for summary judgment, [Doc. 53], be **GRANTED** with respect to these claims and they will not be discussed further herein.

Ala., Bd. of Pardons & Parole Div., 391 F. App'x 753, 754 (11th Cir. 2010) (per curiam) (unpublished); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (per curiam).  "Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law." McCurdy v. DeKalb Cnty., Civil Action File No. 1:09-CV-1989-TWT, 2010 WL 5101405, at *1 (N.D. Ga. Dec. 8, 2010) (citing Fed. R. Civ. P. 56(c)); see also Young v. FedEx Express, 432 F. App'x 915, 916 (11th Cir. 2011) (per curiam) (unpublished); Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010).  The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material facts, upon which the non-moving party must then submit specific facts showing a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Bagwell v. Peachtree Doors & Windows, Inc., Civil Action File No. 2:08–CV–191–RWS-SSC, 2011 WL 1497831, at *10 (N.D. Ga. Feb. 8, 2011), adopted by 2011 WL 1497658, at *1 (N.D. Ga. Apr. 19, 2011); Premier Assocs., Inc. v. EXL Polymers, Inc., No. 1:08-cv-3490-WSD, 2010 WL 2838497, at *8 (N.D. Ga. July 19, 2010).

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of [her] pleading, but must set forth specific

facts showing that there is a genuine issue for trial." <u>Jackson v. B & L Disposal, Inc.</u>, 425 F. App'x 819, 820 (11th Cir. 2011) (per curiam) (unpublished) (first alteration in original) (citation and internal marks omitted); <u>see also</u> <u>Shuler v. Ingram & Assocs.</u>, 441 F. App'x 712, 715 (11th Cir. 2011) (per curiam) (unpublished); <u>Bryant v. U.S. Steel Corp.</u>, 428 F. App'x 895, 897 (11th Cir. 2011) (per curiam) (unpublished). "Speculation or conjecture cannot create a genuine issue of material fact." <u>Shuler</u>, 441 F. App'x at 715 (citation omitted); <u>see also</u> <u>Howard v. Or. Television, Inc.</u>, 276 F. App'x 940, 941 (11th Cir. 2008) (per curiam) (unpublished) (emphasis, citation, and internal marks omitted) ("Speculation does not create a genuine issue of fact."); <u>Goodman v. Ga. Sw.</u>, 147 F. App'x 888, 891 (11th Cir. 2005) (per curiam) (unpublished) (citation and internal marks omitted) ("[A]ll reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable."). "Moreover, the non-moving party cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.'" <u>Morales v. Ga. Dep't of Human Res.</u>, 446 F. App'x 179, 181 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted). "But, [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper." <u>Premier</u>

Assocs., Inc., 2010 WL 2838497, at *9 (alteration in original) (citation and internal marks omitted).

## III.  DISCUSSION

### A.  Title VII and § 1983 Sexual Harassment Claims[33]

"Title VII prohibits sex-based discrimination that alters the terms and conditions of employment."  Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship, 490 F.3d 1302, 1308 (11th Cir. 2007) (citation omitted).  "The Supreme Court has established that sexual harassment claims may take either of two forms: quid pro quo sexual harassment (also called tangible action employment harassment) or hostile work environment sexual harassment."  Arean v. Cent. Fla. Invs., Inc., No. 8:10-cv-2244-T-33MAP, 2012 WL 1191651, at *4 (M.D. Fla. Apr. 10, 2012) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-52 (1998)).  Tangible action harassment occurs where an "employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her."  Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1245 (11th Cir. 2004).  In such a case, if "a supervisor engages in harassment which results in an adverse 'tangible employment action' against the employee, the employer is automatically held vicariously liable for the harassment."

---

[33] It is clear from Fields' briefing that she intends to assert a gender discrimination claim based on sexual harassment, and not two separate claims.  See [Doc. 60 at 3 (alteration in original) (citation omitted) (asserting that "[s]exual harassment can constitute discrimination based on sex for purposes of Title VII")].

Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001) (citations omitted).  In contrast, hostile work environment harassment occurs where the sexual harassment is "sufficiently severe and pervasive to effectively result in a change . . . in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned."  Hulsey, 367 F.3d at 1245.  In this type of harassment case, "an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the *Faragher* and *Ellerth* cases . . . ."  Frederick, 246 F.3d at 1311 (citing Ellerth, 524 U.S. at 765; Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)).

"Section 1983 does not create any substantive rights, but instead, creates a remedy for the deprivation of [a plaintiff's] rights under the Equal Protection Clause of the Fourteenth Amendment . . . ."  Ross v. City of Perry, Ga., No. 5:07-Cv-433 (CAR), 2009 WL 3190450, at *8 (M.D. Ga. Sept. 30, 2009).   Fields contends that Lovelace violated her constitutional right to be free from sexual harassment in the workplace.  See generally [Doc. 1].  "Although the Supreme Court does not regard as identical the constraints of Title VII and the Federal Constitution, when section 1983 is used as a parallel remedy for violation . . . of Title VII, the elements of the two causes of action are the same."  Ross, 2009 WL 3190450, at *8 (alteration in original) (citation and internal marks omitted); see also Cross v. State of Ala, State Dep't of

Mental Health & Mental Retardation, 49 F.3d 1490, 1508 (11th Cir. 1995). Accordingly, Fields' Title VII claim against AISS and § 1983 claim against Lovelace will be analyzed together. See Palisano v. City of Clearwater, 219 F. Supp. 2d 1249, 1254 n.3 (M.D. Fla. 2002) (citations omitted).

1.    *Sexual Harassment Based on a Tangible Employment Action*

a.    **Prima Facie Case**

"To establish a *prima facie* case of tangible employment action sexual harassment, [Fields] must show that (1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) [s]he suffered a tangible employment action; and (5) there is a 'causal link between the tangible employment action and the sexual harassment.'" Smith v. Pefanis, 652 F. Supp. 2d 1308, 1331 (N.D. Ga. 2009), adopted at 1316 (citations omitted). Defendants concede, for the purposes of their summary judgment motion only, that Fields belongs to a protected class and that the second and third elements involve disputed facts. See [Doc. 53-1 at 6]. Accordingly, only the fourth and fifth elements of Fields' sexual harassment claim need be evaluated.

i.    **Tangible Employment Action**

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits, and, in most cases[,] inflicts direct economic harm." Arnold v. Tuskegee Univ., 212 F. App'x 803, 807 (11th Cir. 2006) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted). The parties agree that Fields' termination constitutes a tangible employment action for purposes of her sexual harassment claim. See [Doc. 60 at 8; Doc. 53-1 at 7-8]. Fields also appears to contend that the written warning she received for tardiness and Lovelace's decision to deny her a hearing regarding the sign-in sheet infraction were tangible employment actions. See [Doc. 60 at 7 & n.1; Doc. 1 ¶ 58]. However, warnings are not generally considered adverse employment actions for Title VII purposes, see Clark v. Potter, 232 F. App'x 895, 897 (11th Cir. 2007) (per curiam) (unpublished) (holding that a letter of warning was not an adverse employment action), and while the deprivation of a disciplinary hearing prior to termination could perhaps constitute a "concrete employment benefit" supporting a tangible employment action sexual harassment claim in some circumstances, see Smith v. Akstein, 408 F. Supp. 2d 1309, 1323 (N.D. Ga. 2005), adopted at 1311 (noting that sexual harassment may violate Title VII if it involves the "conditioning of concrete employment benefits on sexual favors"), it is undisputed that Fields was not eligible for a hearing because she was an hourly employee,[34] and

_____

[34] In fact, Fields admitted during her deposition testimony that the reason she was not given a hearing when other employees were is because she was "hourly"

30

she was therefore not denied a tangible benefit of her employment, see [Doc. 63 at 17; Doc. 63-1 at 6; Doc. 65 at 41; Doc. 65-1 at 10; Doc. 66 at 25-26]. Thus, Fields' termination is the only tangible employment action to be addressed for the purposes of her sexual harassment claim.

### ii.     Causation

Defendants assert that Fields has failed to establish a prima facie case of tangible employment action sexual harassment because she cannot show a causal connection between the alleged harassment and her termination. [Doc. 53-1 at 7-8]. To recover under the tangible employment action theory of sexual harassment, "there[] must be a causal link between the tangible employment action and the sexual harassment." Criswell v. Intellirisk Mgmt. Corp., 286 F. App'x 660, 663 (11th Cir. 2008) (per curiam) (unpublished) (citing Frederick, 246 F.3d at 1312). "[T]emporal proximity between the harassment and a tangible employment action can give rise to a genuine issue of fact as to causation. . . ." Orquiola v. Nat'l City Mortg. Co., 510 F. Supp. 2d 1134, 1154 (N.D. Ga. 2007), adopted at 1141 (second alteration in original) (internal marks omitted) (quoting Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1232 (11th Cir. 2006)), and "[t]he shorter the period between the two events, the stronger the inference that the adverse action was improperly motivated,"

———————————

and they were "permanent." [Doc. 58-2 at 102-03].

id. (citations and internal marks omitted); see also Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) (holding that three months is too long to allow a reasonable inference of causation); Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999) (holding that seven weeks was sufficiently proximate to create the causal nexus required for a prima facie case).  Here, the record evidence establishes sufficient temporal proximity between Fields' rejection of Lovelace's sexual advances and her termination to support an inference of causation.  See Palmer v. Albertson's LLC, No. 4:09-CV-00137-SPM-WCS, 2010 WL 785652, at *7 (N.D. Fla. Mar. 3, 2010) (citations omitted) (noting that "[g]enerally a temporal proximity of one month or less satisfies [the causation] standard"); cf. [Doc. 58-2 at 157, 166, 158, 167-71, 178; Doc. 60-5 ¶¶ 13, 17-18, 21-22 (describing instances where Fields rejected Lovelace's advances throughout September of 2009 and her explicit statement that he would not be touching her anymore on October 1, 2009)]; see also [Doc. 58-2 at 108, 122; Doc. 60-5 ¶ 23; Doc. 58-3 at 3 (establishing that Fields was terminated on October 2, 2009)]. However, the inquiry regarding causation does not end there because the identity of the relevant decisionmaker is also important for establishing causation.

"When the alleged harasser is the decisionmaker for the tangible employment action, this gives rise to an inference that the harasser's action was taken *because of* the plaintiff's sex."  Arnold, 212 F. App'x at 807 (citing Llampallas v. Mini-Circuits,

Lab, Inc., 163 F.3d 1236, 1247 (11th Cir. 1998)).  However, if "the harasser is *not* the decisionmaker, [] the plaintiff may not benefit from the inference of causation that would arise from their common identity."  Id. at 807-08 (citing Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam)).  "In this situation, the plaintiff must establish the requisite causal link by showing that the decisionmaker, without having independently evaluated the plaintiff's situation, acted in accordance with the harasser's wishes in taking the tangible employment action against the plaintiff."  Id. at 808 (citation omitted).

Here, Walker, not Lovelace, was the ultimate decisionmaker with respect to Fields' termination.  See [Doc. 63 at 16-17, 28 (noting that Lovelace recommended termination but Walker was required to approve that recommendation)]. Accordingly, Fields can only benefit from an inference that her refusal of Lovelace's advances caused her termination if Walker did not undertake any independent investigation of the charges leading to her termination and merely rubber stamped Lovelace's recommendation.  See Arnold, 212 F. App'x at 807-08 (citations omitted); see also Ross v. Baldwin Cnty. Bd. of Educ., Civil Action No. 06-0275-WS-B, 2008 WL 820573, at *7 (S.D. Ala. Mar. 24, 2008) (citation omitted); Williams v. Ala. Dep't of Transp., 509 F. Supp. 2d 1046, 1059 (M.D. Ala. 2007); Hampton v. City of S. Miami, No. 03-22323-CIV, 2005 WL 5993476, at *11-12 (S.D. Fla. July 29, 2005).

Even when the evidence of record is viewed in the light most favorable to Fields, it reveals that Walker undertook an independent investigation of the charges leading to her termination. Walker specifically testified that even though Fields was not entitled to a hearing, he "brought her to [his] office to get some clarity on what truly happened," and during their conversation, Fields admitted to everything she had been accused of regarding the sign-in sheet incident. See [Doc. 63 at 19-26, 74-75]. Walker testified that he was "involved in the . . . investigation all the way through" and that he "went over the investigation" before approving Lovelace's recommendation, see [id. at 26, 74-75, 84]; see also [Doc. 58-2 at 110-12 (Fields testifying that she did have a meeting with Walker about the incident in which she complained that Lupoe was "broadcasting" information about it to other employees); Doc. 64 at 34-35 (Partridge testifying that even though hourly employees were not entitled to formal investigative processes, Walker tried to treat them the same way as salaried employees); Doc. 66 at 38-39, 47 (Williams testifying that Lovelace's recommendation was the result of him following Walker's instruction and that Walker used Lovelace as his "hatchet man")], and specifically states that after this investigation he felt Fields should be terminated because "the benchmark of termination" had been used for similar behavior in an earlier incident,[35] [Doc. 63 at

---

[35] Several years prior to the sign-in sheet incident involving Fields, several bus drivers had been fired for falsifying documents when they signed in and tried to

34

82-83].  Thus, Fields has failed to establish a genuine issue of material fact with respect to causation regarding her termination since the record demonstrates that Walker independently determined that she should be terminated.

### b.  Legitimate Non-discriminatory Reason and Pretext

Even if the Court found that Fields could benefit from the inference of causation that would exist if Walker had merely rubberstamped Lovelace's recommendation,[36] defendants have set forth an independent reason for Fields' termination that she has failed to rebut; specifically, that she was terminated for falsifying documents after she signed in a co-worker who had not yet arrived at work.[37]  See [Doc. 58-3 at 8]; see also Frederick, 246 F.3d at 1312.  In order to rebut an

_____

collect paychecks for field trips which they had not actually driven.  See [Doc. 63 at 30-31; Doc. 64 at 63-65; Doc. 65-1 at 9; Doc. 66 at 16].

[36] Walker testified in his deposition that he had an investigative meeting with Fields regarding the sign-in sheet incident, an occurrence which is consistent with Fields' testimony that she met with Walker and voiced her disapproval of Lupoe's actions.  See [Doc. 58-2 at 110-12; Doc. 63 at 19-26, 84].  However, Walker told the independent investigator hired by AISS after Fields filed her EEOC Charge that "Lovelace did the investigation" and that he had not spoken with Fields about the sign-in sheet incident.  See [Doc. 63-1 at 5].  Instead, he stated that he had only interviewed the other hourly employee involved.  See [id.].  However, the evidence before the Court establishes that no other hourly employee was involved in the incidents.  See [Doc. 63 at 93-95; Doc. 63-1 at 9-18, 21-22; Doc. 65-1 at 10].

[37] See Simpson v. Fla. Dep't of Corr., 134 F. App'x 303, 305 (11th Cir. 2005) (per curiam) (unpublished) (finding that submission of false time sheets was a legitimate nondiscriminatory reason); Crossdale v. Mt. Sinai Med. Ctr. of Fla., Inc., No. 09-23395-CIV, 2010 WL 3743803, at *4 (S.D. Fla. Sept. 23, 2010) (recognizing that

independent, non-discriminatory justification for a tangible employment action, Fields "must present concrete evidence in the form of specific facts showing that [AISS's] proffered reason was pretextual." Bryant v. Averitt Express, Inc., 375 F. App'x 942, 943 (11th Cir. 2010) (per curiam) (unpublished) (citations and internal marks omitted). "Ultimately, [she] must meet the employer's stated reason 'head on and rebut it, and [s]he cannot succeed by simply quarreling with the wisdom of that reason.'" Young, 432 F. App'x at 917 (citation omitted).

In order to directly attack AISS's reasons, Fields must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Cooper v. S. Co., 390 F.3d 695, 725 (11th Cir. 2004), overruling on other grounds recognized by Andrews-Willmann v. Paulson, 287 F. App'x 741 (11th Cir. 2008) (per curiam) (unpublished) (internal marks omitted) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)). The relevant inquiry in evaluating pretext evidence is not "whether the employer's determination was correct, but whether it constitutes an 'honest explanation' for [the adverse action]." Lowry v. Regis Salons Corp., No. 1:05-cv-1970-WSD, 2006 WL 2583224, at *19 (N.D. Ga. Sept. 6, 2006), adopted at *3 (citing Chapman v. AI Transp.,

_____

terminating someone for allegedly falsifying documents was a legitimate reason).

229 F.3d 1012, 1030 (11th Cir. 2000)).  As evidence that the proffered reason for her termination was pretextual, Fields offers her deposition testimony that she did not know that signing-in a co-worker was wrong and that people engaged in this practice routinely.  See [Doc. 58-1 at 88-95].  However, Fields has "failed to identify any specific individuals or the circumstances surrounding the treatment of those individuals" and the Court cannot find that defendants' proffered reason was pretext "without any specific evidence concerning comparators." Blasingame v. Gen. Motors Corp., Civil Action No. 1:05-cv-1313-GET, 2007 WL 420190, at *15 (N.D. Ga. 2007), adopted at *2 (citations omitted).[38]  Accordingly, this testimony fails to rebut defendants' independent justification for Fields' termination.

Moreover, Fields cannot rely on Williams' opinion that the termination was inappropriate to rebut defendants' independent justification for their actions. Although Williams testified in her deposition that she did not think termination was appropriate because there was no intent to defraud since the time sheet used for pay

---

[38] In fact, the undisputed record evidence shows that the other specifically identified employees who were accused of signing in other absent employees were also terminated for their infraction.  [Doc. 58-2 at 104; Doc. 63 at 84; Doc. 65-1 at 6]. Although Fields makes the conclusory assertion that AISS treated these individuals the same as her in an effort to cover up its discriminatory action, see [Doc. 60 at 10 n.3], the record evidence confirms that the decision to terminate each bus driver was made on October 2, 2009, and that the salaried bus drivers' termination became effective at a later date because their terminations had to be approved by the superintendent, whereas Fields' termination did not. See [Doc. 63 at 93-95; Doc. 63-1 at 9-12, 13-18, 21-22].

and the sign-in sheet were different documents, see [Doc. 66 at 16-18, 41], Fields cannot rebut AISS's independent justification for its action "by simply quarreling with the wisdom of that reason." Young, 432 F. App'x at 917 (citation and internal marks omitted). In other words, Fields cannot show that AISS's offered justification is pretext merely by presenting evidence that other management individuals may have made a different disciplinary choice. Therefore, both because Walker undertook an independent investigation of the charges, negating any inference of causation arising from Lovelace's termination recommendation, see Arnold, 212 F. App'x at 807-08 (citations omitted), and because Fields has failed to offer evidence to rebut the independent grounds AISS asserts as the basis for the tangible employment action, see Frederick, 246 F.3d at 1312, it is **RECOMMENDED** that defendants' motion for summary judgment be **GRANTED** with respect to Fields' tangible employment action sexual harassment claim based on her termination against AISS under Title VII and against Lovelace under § 1983.

**2.** *Sexual Harassment Based on Hostile Work Environment*

In order to establish a prima facie case of hostile work environment sexual harassment, Fields must show: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon her sex; (4) the harassment complained of was sufficiently severe or

pervasive to alter the terms and conditions of employment; and (5) liability against the employer is appropriate.[39] <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245 (11th Cir. 1999); <u>see also</u> <u>Bruno v. Monroe Cnty.</u>, 383 F. App'x 845, 847-48 (11th Cir. 2010) (per curiam) (unpublished); <u>Criswell</u>, 286 F. App'x at 661-62; <u>Jones v. City of Lakeland</u>, 318 F. App'x 730, 735 (11th Cir. 2008) (per curiam) (unpublished).  Defendants assert that Fields' claim fails because she cannot show that any alleged sexual harassment was severe or pervasive enough to alter the terms and conditions of her employment, [Doc. 53-1 at 9-11], and alternatively that liability is not appropriate against either defendant because AISS is entitled to the protection of the <u>Faragher/Ellerth</u> defense, [<u>id.</u> at 11-16], and Lovelace is entitled to qualified immunity, [<u>id.</u> at 25-26].

### a. <u>Severe or Pervasive Requirement</u>

The Eleventh Circuit has noted that the "severe or pervasive" requirement "tests the mettle of most sexual harassment claims." <u>Gupta v. Fla. Bd. of Regents</u>, 212 F.3d 571, 583 (11th Cir. 2000), <u>abrogated on other grounds as recognized by</u> <u>Crawford v. Carroll</u>, 529 F.3d 961, 974 (11th Cir. 2008) (citation omitted).  "And, to be actionable under the statute, the Supreme Court has 'made it clear that [the] conduct must be

---

[39] Defendants concede, for purposes of their motion only, that Fields belongs to a protected class and that the second and third elements involve disputed facts. <u>See</u> [Doc. 53-1 at 6].  Accordingly, only the fourth and fifth elements of Fields' sexual harassment claim need be evaluated here.

extreme.'" <u>Banks v. San-J Int'l</u>, No. Civ.A. 3:00CV184, 2001 WL 34056053, at *3 (E.D. Va. Jan. 18, 2001) (alteration in original) (<u>quoting</u> <u>Faragher</u>, 524 U.S. at 788).

"Whether harassing conduct is sufficiently severe or pervasive to alter the terms and conditions of a plaintiff's employment includes an objective and a subjective component." <u>Blackmon v. Wal-Mart Stores E., L.P.</u>, 358 F. App'x 101, 102 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted); <u>see also</u> <u>Faragher</u>, 524 U.S. at 787; <u>Parker v. Atlanta Newspapers Name Holding Corp.</u>, No. 05-15722, 2006 WL 1594427, at *2 (11th Cir. June 12, 2006) (per curiam) (unpublished); <u>Mendoza</u>, 195 F.3d at 1246. "The plaintiff must subjectively perceive the environment to be abusive, and the conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment." <u>Blackmon</u>, 358 F. App'x at 102 (citation omitted). "This 'inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.'" <u>Wilborn v. S. Union State Cmty. Coll.</u>, Civil Action No. 3:08cv928-MHT, 2010 WL 1294131, at *14 (M.D. Ala. Mar. 30, 2010) (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998)). "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." <u>Id.</u> (alteration in original) (citation and internal marks omitted).

The Eleventh Circuit has identified the following factors that should be considered in the "severe and pervasive" analysis: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Mendoza, 195 F.3d at 1246 (citations omitted); Blackmon, 358 F. App'x at 102-03. Proof is not required on each factor individually as the Court must consider the totality of the circumstances. Hulsey, 367 F.3d at 1248; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); Dar Dar v. Associated Outdoor Club, Inc., 201 F. App'x 718, 721 (11th Cir. 2006) (per curiam) (unpublished). "Although [the Eleventh Circuit] examine[s] the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, the statements and conduct must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met." Gupta, 212 F.3d at 583 (internal citations omitted).

It is not disputed for purposes of the pending motion that Fields subjectively perceived the harassment to be hostile and abusive. However, in order to constitute actionable sexual harassment, the conduct must also be sufficiently severe or pervasive to create an objectively hostile or abusive work environment. See Wilborn,

2010 WL 1294131, at *14 (citation omitted). In support of her allegations, Fields points to the following incidents described in her testimony: (1) comments Lovelace made to her about other women, (2) comments that Fields' shape looked good and that she had a "big butt" like another female co-worker, (3) a question in October of 2008 about how Fields had sex with her boyfriend, (4) two instances in fall of 2008 in which Lovelace looked at Fields' text messages on her personal phone because he wanted to see what her boyfriend had texted her, (5) an instance in early 2009 in which Lovelace brushed his hand across Fields' buttocks, (6) an instance in early 2009 in which Lovelace propositioned Fields for sex, (7) an instance in May of 2009 in which Lovelace propositioned Fields for sex, (8) comments Lovelace made in fall of 2009 about how Fields had a "nice butt" and "nice breasts," (9) a comment on August 28, 2009, about how Fields' buttocks fits perfectly in her uniform pants, (10) asking Fields on August 31, 2009, whether she was wearing a designer bra underneath her uniform shirt, (11) "several occasions" in fall of 2009 in which Lovelace attempted to touch Field's breasts or buttocks behind closed doors in his office, (12) an event on September 1, 2009 when Lovelace touched Fields' buttocks in his office, (13) an event on September 2, 2009, in which Lovelace grabbed Fields' buttocks, pressed against her, and told her he wanted to have sex with her, (14) an event on September 16, 2009, in which Lovelace took out his penis, ripped Fields' blouse exposing her breast,

pinned Fields against a closed door, pulled down her pants and tried to force his penis into her buttocks, (15) asking on September 29, 2009, for Fields to turn around so that he could look at her buttocks, and (16) asking for a hug on October 2, 2009, after Fields was terminated.  [Doc. 58-2 at 108, 122, 145, 149-52, 154, 157-58, 166-71, 183;  Doc. 60-5 ¶¶ 6-13, 15, 17-18, 21, 23].

Considering the totality of these circumstances, Fields "has established the objective reasonableness of her perception that she was subjected to severe and pervasive harassment that created an abusive work environment."  Freytes-Torres v. City of Stanford, 270 F. App'x 885, 890 (11th Cir. 2008) (per curiam) (unpublished). Indeed, even a single incident of harassment can be severe and pervasive if it is "extremely serious."  See Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1285 n.12 (11th Cir. 2003) (per curiam) (citing Faragher, 524 U.S. at 788); Demmons v. Fulton Cnty., Civil Action File No. 1:09-CV-2312-TWT-WEJ, 2010 WL 3418325, at *12 (N.D. Ga. Aug. 2, 2010), adopted by 2010 WL 3418328, at *1 (N.D. Ga. Aug. 25, 2010) (citing Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001) (holding that single incident of rape would be sufficiently severe to alter the conditions of the victim's employment, creating abusive work environment for purposes of Title VII)). Here, the incidents of harassment Fields recounts in which Lovelace allegedly physically assaulted her behind closed doors and in the storage closet are alone

sufficiently serious to constitute severe and pervasive conduct under Title VII.  See Freytes-Torres, 270 F. App'x at 888, 890-91 (finding harassment to be severe and pervasive based on one instance of harassment where employer physically restrained employee from leaving his office and warned her not to tell anyone, and a second instance of harassment where the employer accosted the employee alone in the stairwell, leaning into her body and deliberately smelling her breasts); Walton, 347 F.3d at 1285 & n.12 (finding the alleged incidents of "fondling and sexual assault" whether "isolated or not" to be extremely serious such that they amount to actionable sexual harassment under Title VII); U.S. E.E.O.C. v. Dillard's Inc., No. 6:07-cv-1496-Orl-19GJK, 2009 WL 789976, at *9 (M.D. Fla. Mar. 23, 2009) (finding a single incident sufficient to state a claim under Title VII where a supervisor led an employee into a storage room and then masturbated with the apparent hope the employee would watch as the incident was orchestrated for his own sexual gratification).[40]

---

[40] In their statement in opposition to Fields' statement of facts which present a genuine issue for trial, defendants' make much of the fact that Fields' evidence of these incidents of sexual assault consists only of her own deposition and affidavit testimony, citing case law for the proposition that "[p]laintiff may not defeat summary judgment by relying on . . . bare and self-serving allegations." McGee v. Coca Cola Bottling Co. Consol., No. 4:08-CV-60 (WLS), 2010 WL 3855250, at *10 (M.D. Ga. Sept. 27, 2010) (citing Bryant v. Rich, 530 F.3d 1368, 1382 (11th Cir. 2008)); see also [Doc. 70].  However, in a "he said/she said" situation as presented here where much of the alleged sexual harassment took place behind closed doors in one-on-one situations, "[t]o hold that testimony under oath by an interested party cannot be substantial evidence of a fact in that party's favor would undermine much of the law on summary judgment." Price v. Time, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005).

Accordingly, the record contains sufficient evidence to establish a genuine issue of material fact with respect to the severe and pervasive element of Fields' prima facie hostile work environment sexual harassment claim.

### b.  Liability of the Employer

### i.  AISS's Liability: *Faragher/Ellerth* Defense

Generally, an employer may be held liable for sexual harassment based on a hostile work environment where it "knew or should have known of the harassing conduct but failed to take prompt remedial action." Smith, 652 F. Supp. 2d at 1324 (citations and internal marks omitted). Here, defendants assert that liability against AISS is not appropriate because it is entitled to the protection of the Faragher/Ellerth defense. [Doc. 53-1 at 11-16].

"When no tangible employment action is taken by an employer, that employer may raise the *Faragher/Ellerth* defense, subject to proving by a preponderance of the evidence: '(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" E.E.O.C. v. SDI Athens E., LLC, 690 F. Supp. 2d 1370, 1381 (M.D. Ga. 2010) (quoting Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296-97 (11th Cir. 2000) (internal marks omitted));

see also Smith, 652 F. Supp. 2d at 1324 (citations and internal marks omitted) (noting that liability is appropriate against an employer only if they "knew or should have known of the harassing conduct but failed to take prompt remedial action"). "As an affirmative defense, the defendant bears the burden of establishing both of these elements." Nurse "BE", 490 F.3d at 1309 (citation omitted).

With respect to the first prong of the defense, "[a]n employer can generally satisfy its reasonable care requirement by, first, promulgating a comprehensive anti-harassment policy and, second, promptly responding to the employee's complaint."[41] Howard v. City of Robertsdale, 168 F. App'x 883, 887 (11th Cir. 2006) (unpublished) (citation omitted). "In determining whether an anti-harassment policy is sufficiently reasonable, [courts] look to whether the employer made it well-known to employees, vigorously enforced it, and included alternate avenues of redress. Id. (citation omitted); see also Atwell v. Smart Ala., LLC, 546 F. Supp. 2d 1250, 1265 (M.D. Ala. 2008) (citing Madray, 208 F.3d at 1298) (citation omitted) ("At a minimum, the policy must allow a harassed employee to report harassment by a supervisor without having to report the harassment first to the harassing supervisor."). With respect to

---

[41] Fields has not offered any evidence or arguments to show that AISS did not respond promptly once she reported the harassment by filing an EEOC complaint. [Doc. 65 at 15]. Accordingly, AISS has met this prong of the defense and the Court will only evaluate whether the sexual harassment policy was reasonable and made sufficiently well known to employees. See Howard, 168 F. App'x at 887 (citation omitted).

the second prong, "an employer can generally satisfy its burden by showing the employee failed to follow its complaint procedures," Howard, 168 F. App'x at 887 (citing Frederick, 246 F.3d at 1314), although credible threats of retaliation may excuse an employee's failure to comply with the employer's reporting policy, see Walton, 357 F.3d at 1290-91 (citations omitted); see also Howard, 168 F. App'x at 887 (citations omitted).

As a preliminary matter, AISS's sexual harassment policy clearly provides sufficient avenues of redress as it specifically states that any employee who feels he or she has been harassed may "report the alleged act to a principal, assistant principal, director, executive director, or other senior level administrator." See [Doc. 53-3 ¶ 8]. Moreover, the record includes evidence showing that the policy was rigorously enforced. See, e.g., [Doc. 63 at 59-60; Doc. 66 at 22 (Williams testifying that an AISS employee was fired after he was found to have sexually harassed his clerical assistant)]. However, Fields contends that AISS is not entitled to the benefit of this defense because she was unaware of how to proceed under the policy. See [Doc. 60 at 18-20 & n.6].

In some situations, courts have found that an employer effectively disseminated a reasonable anti-sexual harassment policy, satisfying the first prong of the Faragher/Ellerth defense, even when a plaintiff claimed to be unaware of the

appropriate reporting procedures. See, e.g., Jackson v. Cintas Corp., 391 F. Supp. 2d 1075, 1092-93 (M.D. Ala. 2005) (citations omitted). In so doing, courts attribute constructive knowledge of the policy to a plaintiff where the employer presents evidence that the employee received a copy of the policy and signed some sort of acknowledgment indicating its receipt, despite the fact that the plaintiff may or may not have actually read the policy. See, e.g., Asklar v. C.H. Robinson Worldwide, Inc., No. 06-22321-CIV, 2007 WL 7084789, at *6 n.6 (S.D. Fla. 2007) (finding that plaintiffs' claims that they were unaware of the policy did not defeat defendant's summary judgment motion on the basis of the Faragher/Ellerth defense because defendant showed that both plaintiffs signed forms acknowledging their receipt of the policy); McDaniel v. Merlin Corp., No.Civ.A.1:01CV2992JEC, 2003 WL 21685622, at *10 (N.D. Ga. June 26, 2003), adopted at *1 (finding that employer complied with its burden where it produced plaintiff's signed acknowledgment that it was her responsibility to read and comply with the handbook containing the employer's anti-harassment policy).

The evidence of record establishes that Fields attended training at South Atlanta High School conducted by Partridge in August of 2008 during which Partridge reviewed the transportation department handbook with the bus drivers, primarily focusing on student safety issues. See [Doc. 58-2 at 195-96]; see also [Doc.

48

58-5].  According to Partridge's testimony, this large group meeting included a day of training in which state mandated programs for bus drivers were addressed in the morning, and district mandated programs for bus drivers were addressed in the afternoon.  See [Doc. 64 at 55-60].  During the afternoon session, representatives from HR or OIR came in to discuss the sexual harassment policy, which was presented to the employees in a separate packet,  [id. at 55-60, 98-99, 107-08; Doc. 64-1 at 27-43], and the employees were then required to sign an acknowledgment form in the transportation department handbook regarding the policy, see [Doc. 64 at 89-90; Doc. 58-5 at 39].

Partridge specifically testified that no driver would have been excused from any portion of this classroom training.[42]  [Doc. 64 at 98-99, 107-08].  However, Fields testified that she was excused from the afternoon portion of the training because she already had the necessary school and passenger endorsement authorizing her to transport school children, [Doc. 58-1 at 46-47; Doc. 58-2 at 195], and she asserts that she was not in attendance at any AISS training session during which the sexual harassment policy and/or reporting procedures were discussed, reviewed or disseminated, see [Doc. 58-2 at 124-25, 194-95, 204], and that she never reviewed any

---

[42] Instead, Partridge contends drivers with the appropriate passenger certifications would have been excused from portions of the on-road training.  [Doc. 64 at 43-44].

such online policy during her employment with AISS, [id. at 124; Doc. 60-5 ¶ 25]. Moreover, AISS has failed to produce the acknowledgment form that Fields should have signed as part of the training, and her personnel file does not contain the long form checklist showing that she completed the sexual harassment training. See [Doc. 64 at 73-75].

Accordingly, "[t]here are factual disputes as to [whether Fields] personally received a copy of the anti-harassment policy [and] whether she received any training or other oral notice of the policy . . . " and "[a]lthough [AISS] engaged in various efforts to distribute its sexual harassment policy . . . , for example, through its [] employee orientation program, the evidence [does not] indicate[] that these efforts . . . extend[ed] to [Fields]." Jackson, 391 F. Supp. 2d at 1096 (declining to grant summary judgment on the basis of the Faragher/Ellerth defense where similar questions regarding whether plaintiff was specifically aware of the policy existed); see also E.E.O.C. v. Family Dollar Stores, Inc., Civil Action File No. 1:06-CV-2569-TWT, 2008 WL 4098723, at *27 (N.D. Ga. Aug. 28, 2008), adopted at *1 (finding that defendant did not make adequate showing to raise the Faragher/Ellerth defense at the summary judgment stage where they presented no evidence to rebut plaintiff's testimony that he did not see a poster outlining the sexual harassment policy that was posted in the store and was thus unaware of the anti-harassment policy). As a

result, AISS has not met its burden to show that it is entitled to the Faragher/Ellerth affirmative defense, and genuine questions of fact exist as to whether there is a basis to hold AISS liable for the alleged harassment, so it is **RECOMMENDED** that defendants' motion for summary judgment, [Doc. 53], be **DENIED** with respect to Fields' hostile work environment sexual harassment claim under Title VII against AISS.

### ii.     Lovelace's Liability: Qualified Immunity

Generally, a supervisor may be held liable for an employee's § 1983 claim where he personally participates in the alleged constitutional violation. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted). However, with respect to Fields' § 1983 claim against Lovelace, defendants assert that Lovelace is protected by qualified immunity. [Doc. 53-1 at 25-26].

Qualified immunity protects government officials sued in their individual capacities if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (citation and internal marks omitted); see also Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1327 (11th Cir. 2003). The Eleventh Circuit has specifically explained that

> [a] denial of qualified immunity at summary judgment necessarily
> involves two determinations: 1) that on the facts before the court, taken

in the light most favorable to the plaintiff, a reasonable jury could find that the defendant engaged in certain conduct, and 2) that the conduct violated "clearly established law" such that a reasonable person in the defendant's position would have had notice that his actions were unlawful.

Mencer v. Hammonds, 134 F.3d 1066, 1070 (11th Cir. 1998) (citing Johnson v. Clifton, 74 F.3d 1087, 1091 (11th Cir. 1996)). Here, if a reasonable jury believes Fields' allegations over Lovelace's denial, including the allegation that Lovelace trapped her inside a storage closet and sexually assaulted her, a "jury could very reasonably find that [Lovelace's] behavior was clearly and obviously in violation of existing federal law." Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 803 (11th Cir. 1998) (denying the harassing supervisor's claim for qualified immunity and allowing plaintiff's Equal Protection claim to proceed); see also Palisano, 219 F. Supp. 2d at 1257 (citation omitted) ("In [the Eleventh] Circuit, the right to be free from sexual harassment in the workplace is clearly established."). Accordingly, qualified immunity does not bar Fields' § 1983 claim against Lovelace, and genuine questions of fact exist as to whether there is a basis to hold Lovelace liable for the harassment, and it is therefore **RECOMMENDED** that defendants' motion for summary judgment be **DENIED** with respect to Fields' § 1983 hostile work environment sexual harassment claim against Lovelace.

**B.      Remaining State Law Claims Against Lovelace**

In addition to her federal claims, Fields asserts claims of assault and battery, invasion of privacy, and IIED against Lovelace.  [Doc. 1 ¶¶ 76-93].   Defendants contend that Lovelace is entitled to summary judgment on Fields' invasion of privacy and assault and battery claims under the applicable statute of limitations, and that Fields' IIED claim fails as a matter of law.  [Doc. 53-1 at 26-29].   Alternatively, defendants contend that Fields' state law claims are barred by the doctrine of official immunity.  [Id. at 30].

**1.      *Statute of Limitations***

Defendants assert that Fields' invasion of privacy and assault and battery claims are barred by the relevant statute of limitations.  See [Doc. 53-1 at 30].  These claims "sound it tort" and thus a two-year statute of limitations applies.  See Williams v. Lee, Civil Action File No. 1:11-CV-4596-TWT-JFK, 2012 WL 1080578, at *4 (N.D. Ga. Mar. 1, 2012), adopted by 2012 WL 1080572, at *1 (N.D. Ga. Mar. 30, 2012) (citation omitted) (applying a two-year statute of limitations under Georgia law to plaintiff's claims of sexual harassment, assault and battery, and invasion of privacy); see also O.C.G.A. § 9-3-33.  Accordingly, the Court finds that any conduct

occurring before August 19, 2009, is precluded from consideration with respect to these claims pursuant to the statute of limitations.[43]

### 2.    IIED Claim

To prevail on an IIED claim under Georgia law, Fields must show that (1) the conduct was extreme and outrageous; (2) Lovelace acted recklessly or intentionally; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. Trimble v. Circuit City Stores, Inc., 469 S.E.2d 776, 778 (Ga. Ct. App. 1996); Bridges v. Winn-Dixie Atlanta, Inc., 335 S.E.2d 445, 447-48 (Ga. Ct. App. 1985); see also Soloski, 600 F. Supp. 2d at 1371. "The burden that a plaintiff must meet in order to prevail on this claim is a stringent one." Soloski v. Adams, 600 F. Supp. 2d 1276, 1371

---

[43] Fields concedes that her assault and battery and invasion of privacy claims are limited to the time period beginning August 19, 2009 and afterwards. See [Doc. 60 at 28]. However, given that defendants do not assert that the events alleged to have occurred after that date are insufficient to support Fields' claims, see generally [Doc. 53], and the fact that Fields testified about sexual assaults occurring within the relevant time period, see [Doc. 58-2 at 158, 167-71; Doc. 60-5 ¶ 18], these claims survive summary judgment, see Hackett v. Fulton Cnty. Sch. Dist., 238 F. Supp. 2d 1330, 1369 (N.D. Ga. 2002) (first alteration in original) (citations and internal marks omitted) ("The Georgia Court of Appeals has held that '[a]ny unlawful touching of a person's body, even though no physical injury ensues, violates a personal right and constitutes a physical injury to that person. Any act of physical violence . . . inflicted on the person of another, which is not necessary, is not privileged, and which constitutes a harmful or offensive contact, constitutes an assault and battery.'"); Troncalli v. Jones, 514 S.E.2d 478, 482 (Ga. Ct. App. 1999) (upholding invasion of privacy claim where the defendant brushed up against and intentionally touched plaintiff's breasts and finding that the conduct constituted an intrusion upon the plaintiff's seclusion or solitude).

(N.D. Ga. 2009), adopted in relevant part at 1322 (citation omitted). Liability is only found where the defendant's conduct was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Hajhossein v. City of Statesboro, No. 609CV048, 2010 WL 538209, at *3 (S.D. Ga. Feb. 12, 2010) (internal marks omitted) (quoting Kaiser v. Tara Ford, Inc. 546 S.E.2d 861, 868 (Ga. Ct. App. 2001)). Defendants assert that Lovelace is entitled to summary judgment on Fields' IIED claim because the conduct supported by the record evidence is not outrageous enough to sustain her claim and because Fields "cannot demonstrate that she suffered the requisite level of distress for this claim to withstand summary judgment." [Doc. 53-1 at 27-29].

Whether a claim rises to the requisite level of outrageousness and egregiousness is a question of law to be determined by the court. See Cook v. Covington Credit of Ga., Inc., 660 S.E.2d 855, 858 (Ga. Ct. App. 2008) (citation omitted). Here, the Court finds, at a minimum, that Fields' testimony that Lovelace sexually assaulted her in a storage closet by grabbing at her blouse, exposing her left breast, pinning her against the closed door, pulling her pants down, and attempting to force his penis through the cheeks of her buttocks describes outrageous conduct sufficient to support an IIED claim. See Hammond v. Gordon Cnty., 316 F. Supp. 2d 1262, 1293 (N.D. Ga. 2002) (citation omitted) (finding evidence that defendant

sexually assaulted plaintiff sufficient to support an IIED claim); Simon v. Morehouse Sch. of Med., 908 F. Supp. 959, 972 (N.D. Ga. 1995) (noting evidence of sexual assault and sexual advances was sufficient to prove outrageous and extreme conduct for purposes of IIED claim).

In support of their contention that Fields did not suffer sufficient distress to support her claim, defendants point to the fact that she did not report the alleged harassment to management and the fact that she did not seek treatment until several months after her employment ended. [Doc. 53-1 at 29]. However, Fields has presented sufficient evidence to permit a reasonable juror to determine that she suffered extreme emotional distress as a result of the alleged harassment. See Trimble, 469 S.E.2d at 778. As previously discussed, Fields testified that she did not report the harassment because she was both unaware of the specific procedure for doing so and afraid that pursuing such a complaint would result in her being fired. [Doc. 58-2 at 117, 158, 160]; see also [Doc. 58-2 at 155, 199; Doc. 60-5 ¶ 2]. Moreover, Fields testified that she was delayed in seeking medical treatment because she did not have health insurance, see [Doc. 58-1 at 48; Doc. 60-2 ¶ 35], and the record contains evidence in the form of both Fields' testimony and medical records showing that Fields suffered from bouts of depression, sleeplessness, anxiety, and various other psychological and emotional issues, including a clinical diagnosis of post-

56

traumatic stress syndrome, following these events, [Doc. 58-2 at 188-89; Doc. 60-5 ¶ 29; Doc. 58-3 at 65-100].  Therefore, because Fields has presented evidence of conduct that is extreme and outrageous as a matter of law, and because the record contains sufficient evidence to create a genuine issue of material fact as to whether Fields in fact suffered extreme emotional distress as a result of the alleged events, defendants' motion for summary judgment is due to be denied with respect to Fields' claim for IIED.

### 3.    *Official Immunity*

Defendants assert that Lovelace is entitled to official immunity with respect to all of Fields' state law claims.  See [Doc. 53-1 at 26-27].  Official immunity protects public employees "from individual liability for discretionary acts undertaken in the course of their duties and without wilfulness, malice, or corruption."  Hemak v. Houston Cnty. Sch. Dist., 469 S.E.2d 679, 681 (Ga. Ct. App. 1996); see also Hackett, 238 F. Supp. 2d at 1368 (citation omitted).  In the context of official immunity, "malice means a deliberate intention to do a wrongful act," and "such act may be accomplished with or without ill will and whether or not injury was intended."  Phillips v. Hanse, 637 S.E.2d 11, 13 (Ga. 2006) (alteration, footnote, citation, and internal marks omitted); see also Adams v. Hazelwood, 520 S.E.2d 896, 898 (Ga. 1999).  Here, Fields testified that Lovelace engaged in a number of harassing actions

and patently wrongful acts, including sexual assault and battery, and this evidence is therefore sufficient to raise a genuine issue of material fact as to whether Lovelace acted with malice, eliminating the protection of official immunity for his actions.[44] See Gardner v. Rogers, 480 S.E.2d 217, 220 (Ga. Ct. App. 1996) (finding that defendant was not entitled to summary judgment on the basis of official immunity for assault and battery claim where "the jury could conclude that his actions were intentional and carried out with wilfulness, malice or corruption, in violation of a known right"). Accordingly, since Fields has presented sufficient evidence to raise genuine questions of fact regarding her state law claims of invasion of privacy, assault and battery, and IIED, and a genuine question of fact exists as to whether or not Lovelace acted with malice that would preclude him from the benefit of official immunity, it is **RECOMMENDED** that defendants' motion for summary judgment, [Doc. 53], be **DENIED** with respect to these claims.

## IV. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that defendants' motion for summary judgment, [Doc. 53], be **GRANTED** with respect to Fields' Title VII

---

[44] Similarly, because a genuine question exists as to whether Lovelace acted with malice, Fields' request for punitive damages survives summary judgment. See O.C.G.A. § 51-12-5.1(b) (noting that punitive damages are available in tort only where defendants' actions showed "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences").

tangible employment action sexual harassment claim against AISS, her § 1983

tangible employment action sexual harassment claim against Lovelace, her § 1983

claim against AISS, and her state law claim for negligent

training/hiring/supervision/retention against AISS, but **DENIED** with respect to

her Title VII hostile work environment sexual harassment claim against AISS, her

§ 1983 hostile work environment sexual harassment claim against Lovelace, and her

state law claims for invasion of privacy, assault and battery, and IIED against

Lovelace.

      **IT IS SO RECOMMENDED**, this 30th day of November, 2012.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE